UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TERENCE ANDERSON,                  )
                                   )
            Plaintiff,             )
                                   )
       v.                          )        No. 4:06 CV 1779 DDN
                                   )
MICHAEL J. ASTRUE,[1]              )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Terence Anderson for supplemental security income under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381 et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the ALJ is affirmed.

**I.  BACKGROUND**

Plaintiff Terence Anderson was born on September 14, 1955.[2] (Tr. 81, 142.) He is 6'1" tall, with a weight that has ranged from 250 pounds to 280 pounds. (Tr. 195, 1135.) He completed twelve years of school, and last worked as a custodian for a church. (Tr. 50, 1224-26.) Before working in the church, he held various part-time jobs, and also worked as a cabinet-maker and dishwasher. (Tr. 50.)

On December 26, 2000, Anderson applied for supplemental security income, alleging he became disabled on March 1, 1997, as a result of

---

[1]Jo Anne B. Barnhart was the original defendant. Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted as defendant in this suit. 42 U.S.C. § 405(g).

[2]Some of the Social Security Administration's records incorrectly state that Anderson was born on October 14, 1955. ( See Tr. 17, 30.)

diabetes, an enlarged hernia, and fluid in his knees. He also complained of indigestion, heartburn, bloating, swelling, headaches, and joint pain. (Tr. 50-51.) After a hearing on February 13, 2002, the ALJ denied benefits on May 2, 2002. (Tr. 36-44.) In his decision, the ALJ found Anderson suffered from severe impairments, namely degenerative arthritis of the knees and a ventral hernia.[3] However, the ALJ determined that these impairments were not disabling. The ALJ also found Anderson's subjective complaints and limitations not completely credible. Ultimately, the ALJ concluded Anderson had the residual functional capacity to lift twenty pounds occasionally, carry ten pounds frequently, and sit, stand, and walk on finished or even surfaces throughout a normal workday. (Tr. 55-56.) On September 26, 2002, the Appeals Council denied plaintiff's request for review. (Tr. 46-47.)

On appeal to the district court, the undersigned found the ALJ had failed to indicate the weight given to the opinion of Anderson's treating physician, Dr. Eric Washington, M.D. (Tr. 61.) The case was reversed and remanded to the ALJ on March 17, 2004. On remand, the ALJ was to evaluate the opinion of Dr. Washington, and provide sufficient reasons for the weight accorded to his opinion. (Tr. 49.)

On remand, the ALJ held a supplemental hearing on October 7, 2004. (Tr. 25.) On November 24, 2004, the ALJ again denied benefits.[4] (Tr. 16-24.) On October 18, 2006, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 16-24.)

---

[3]A hernia is the protrusion of a part or structure through the tissues normally containing it. Stedman's Medical Dictionary, 707 (25th ed., Williams & Wilkins 1990). Ventral is pertaining to the belly. Id., 1706.

[4]On June 26, 2002, Anderson filed another application for supplemental security insurance under Title XIV, alleging he became disabled on December 1, 2001, as a result of diabetes, stress, arthritis, and knee problems. (Tr. 16, 138.) The claim was initially denied on October 22, 2002. (Tr. 64.) The ALJ's decision on November 24, 2004, denied the applications of December 26, 2000, and June 26, 2002. (See Tr. 16.)

## II.  MEDICAL HISTORY AFTER MAY 2, 2002 [5]

On May 14, 2002, Anderson went to Saint Louis ConnectCare, for a follow-up.  Doctors diagnosed Anderson with a large ventral hernia, arthritis, diabetes, hypertension, and depression.  His anemia was resolved.[6]  (Tr. 1068-69.)

On June 7, 2002, Dr. Eric Washington, M.D., performed a left knee arthroscopy with partial lateral meniscectomy.[7]  The surgery was to correct a lateral meniscus tear and advanced degenerative disease of the left knee.  There were no complications and Anderson was transferred to recovery in stable condition.  (Tr. 237, 1101-02.)

On June 26, 2002, Anderson completed a disability report.  He complained of a knot in the middle of his back, a hernia, bad knees, arthritis in his legs, arms, and hands, diabetes, and stress.  The conditions caused his joints to stiffen, making it difficult to sit, stand, walk, climb, or bend.  The conditions caused him pain and made him feel depressed.  Anderson reported being unable to work as of December 26, 2000, because of his conditions.  Anderson also reported that he stopped working on March 15, 2001, having been fired for being unable to keep up with the required work.  From December 2000 to March 15, 2001, Anderson worked as a dishwasher, seven hours a day, five days a week.  As part of the job, he would walk and stand four hours each day, frequently lift twenty-five pounds, and lift up to fifty pounds.  (Tr. 195-204.)

---

[5]Anderson's medical history up to May 2, 2002, is covered in the court's earlier decision.  See Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1189-91 (E.D. Mo. 2004).

[6]Anemia is the condition where the number of blood cells, the amount of hemoglobin within the blood, and the volume of packed red blood cells within the blood are less than normal.  Anemia is often characterized by pale skin, shortness of breath, heart palpitations, lethargy, and fatigue.  Stedman's Medical Dictionary, 72.

[7]Arthroscopy is examination of the interior of a joint using an endoscope.  Stedman's Medical Dictionary, 136.  A meniscectomy is the surgical removal of all or part of a torn meniscus. http://www.webmd.com/search.  The meniscus is a fibrocartilaginous structure of the knee.  Id., 944.

On June 26, 2002, Ms. C Koko completed a disability report, after interviewing Anderson in person.  Koko noted Anderson had difficulty walking and answering questions.  He appeared older than his stated age, was obese, and walked with a cane.  Koko did not believe Anderson had any difficulty breathing, concentrating, sitting, standing, or using his hands.  (Tr. 205-08.)

On July 15, 2002, Anderson visited ConnectCare, complaining of knee pain.  At the time, he was taking Glucophage and Iron.[8]  A physical examination showed his neuromuscular sensation was within normal limits and cardiopulmonary vitals were also within normal limits.  Anderson had an antalgic gait and walked with a straight cane.[9]  The doctors believed Anderson would benefit from physical therapy and suggested exercises to increase his strength and range of motion.  (Tr. 1073-76.)

On July 30, 2002, a physical therapist noted Anderson had increased his activity level.  Anderson had worked on lights in his ceiling, and climbed up a few steps on a ladder for multiple hours.  However, he noted increased pain that evening.  Finally, the physical therapist stated that Anderson was frequently walking without his cane.  (Tr. 1079.)

On August 7, 2002, Anderson told his physical therapist that his pain was minimal, and that he was back to performing more than 50% of his normal activities.  He could perform partial squats, hip extensions, and heel raises, and was able to ride a stationary bike for seven minutes.  He was walking without his cane, unless his knee felt "tired." (Tr. 1079.)

On August 14, 2002, Anderson had an increased activity level and noted his pain was 3/10.  Anderson was walking without his cane most of the time, and could perform partial squats.  No further physical therapy was scheduled.  (Tr. 237, 1080.)

On August 23, 2002, Anderson completed another disability report. He complained of torn ligaments and arthritis in his left leg, a hernia,

---

[8]Glucophage is used to control high blood sugar. http://www.webmd.com/drugs. (Last visited February 4, 2008).

[9]An antalgic gait refers to a posture or gait assumed in order to avoid or lessen pain.  See Stedman's Medical Dictionary, 65, 91.

a knot in his back, arthritis in his arms, and diabetes.  Because of his impairments, Anderson could not walk farther than a block, bend, stoop, or climb ladders, or lift anything heavier than a telephone.  He reported being unable to work as of December 15, 2000, because of his conditions.  From October 2000, until December 2000, Anderson worked as a dishwasher, five hours a day, five days a week.  As part of the job, he would walk for two hours and stand for three hours each day.  He would frequently lift fifty pounds or more, and might lift up to seventy-five pounds.  He said he was "fired because [he] couldn't maneuver like [he] should."  (Tr. 215-23.)

On October 15, 2002, a Disability Determination Services (DDS) Counselor completed a physical residual functional capacity assessment. The counselor believed Anderson could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  The counselor believed Anderson could perform unlimited pushing and/or pulling.  The counselor found Anderson had some postural limitations, but could still occasionally climb, stoop, kneel, crouch, and crawl, and frequently balance.  The counselor found Anderson did not have any manipulative, visual, communicative, or environmental limitations.  In reaching these conclusions, the counselor noted Anderson's alleged impairments.  Anderson complained chiefly of pain, with the pain increasing with movement and walking.  At the same time, Anderson was able to shop for groceries and attend church around three times a week.  (Tr. 1116-22.)

On October 17, 2002, Anderson completed a pain questionnaire.  He noted the pain was sharp, occurred off and on several times a day, and affected his legs, back, arms, and shoulders.  Moving, walking, and laying down produced the pain.  Because of the pain, bending, squatting, stooping, reaching, standing, and sitting were all difficult.  Anderson noted taking Ibuprofen and doing physical therapy to help relieve the pain.  (Tr. 224.)

On October 17, 2002, a DDS Counselor believed Anderson was capable of significant gainful activity.  (Tr. 237.)

On February 5, 2003, an MRI of the left shoulder showed minimal degenerative joint disease, and no evidence of any fractures, dislocations, or other bony pathology.  (Tr. 1149.)

On February 8, 2003, Anderson visited ConnectCare, complaining of left shoulder pain.  (Tr. 1129.)  On March 17, 2003, Anderson visited ConnectCare, complaining of knee pain.  (Tr. 1131.)

On May 12, 2003, Anderson visited ConnectCare, complaining of severe right knee pain.  Doctors diagnosed him with uncontrolled diabetes and degenerative joint disease, and prescribed Naproxen and Ultracet.[10]  (Tr. 1132.)

On August 18, 2003, Anderson visited ConnectCare, for a follow-up visit.  He noted no new problems.  The doctors diagnosed him with diabetes with increased insulin, and degenerative joint disease.  He was advised to pay greater attention to his diet.  (Tr. 1133.)

On January 5, 2004, Anderson was admitted to St. Louis University Hospital for diabetic neuropathy of the cranial nerve and double-vision.[11]  A physical examination showed Anderson was obese, but pleasant and cooperative, with no acute distress.  A cardiovascular exam was unremarkable and a neurological exam revealed only left sixth nerve palsy and sluggish pupils.[12]  A CT scan of the head and an MRI of the brain were normal.  Anderson was discharged the next day, in stable condition, and told not to drive until his double-vision was resolved. The doctors did not impose any other restrictions on Anderson.  (Tr. 1159-61, 1167-74, 1204-06.)

---

[10]Naproxen is used to relieve mild to moderate pain from various conditions.  It can reduce the pain, swelling, and joint stiffness caused by arthritis.  Ultracet is also used to treat pain, particularly short term pain.  http://www.webmd.com/drugs. (Last visited February 4, 2008).

[11]Neuropathy is any disorder affecting any segment of the nervous system.  Stedman's Medical Dictionary, 1048.

[12]Sixth nerve palsy is characterized by double vision and is caused by damage to the cranial nerve, which controls lateral eye movements. http://en.wikipedia.org/wiki/Sixth_nerve_palsy (Last visited February 4, 2008).

On March 22, 2004, Anderson visited ConnectCare, for a check-up. He noted fatty tissue on his back. (Tr. 1139-40.)

On October 8, 2004, Anderson visited ConnectCare, complaining of bumps on his back and left knee pain with swelling. Anderson also complained of headaches. (Tr. 1144.)

**Testimony at the Supplemental Hearing**

At the hearing on October 7, 2004, Anderson described his recent medical history. In January 2004, he was hospitalized for a slight stroke of the eye. Anderson also had surgery on his left knee, but the surgery had not really helped his pain. His left knee would still swell and bruise. His right leg hurt from arthritis. Anderson noted he had a fatty tumor in the center of his spinal cord, and that the doctors had told him to refrain from heavy lifting. There was no change to his hernia. (Tr. 1217-22.)

Because of his leg pain, Anderson had trouble standing or sitting for prolonged periods. He could not climb a ladder and had trouble balancing. His back pain prevented him from lifting any more than fifteen or twenty pounds. Mopping around the house placed strain on his back. The doctors had prescribed Ibuprofen for his back pain, but Anderson said the medication did not really help the pain. At the time of the hearing, Anderson's doctors recommended against having back surgery. (Tr. 1222-24.)

Anderson noted attending church regularly. In June 2002, Anderson began doing maintenance work for the Transfiguration Lutheran Church. He worked around twenty-five or thirty hours a week, making $9.00 an hour. As part of his job, he vacuumed the carpet, dusted, mopped, cleaned the restrooms, and emptied the trash. Because of his limitations, he did not help with the deliveries or do other lifting. The church did not provide any benefits to Anderson, but the church withheld taxes from his paycheck. (Tr. 1224-32.)

## III. DECISION OF THE ALJ

In his decision, the ALJ noted Anderson's medical history and work history since the time of the May 2, 2002, decision. The ALJ also noted

the previous examinations by Dr. Washington and Anderson's testimony during the supplemental hearing on October 7, 2004.  (Tr. 16-24.)

Anderson testified that he started working as a church custodian in June 2002.  According to the earnings guidelines, Anderson's custodial work amounted to substantial gainful activity.  Anderson did not argue the job was subsidized, or that he was otherwise being paid for work he did not do.  (Tr. 19.)

In February 2001, Dr. Washington found Anderson could be on his feet as tolerated.  Dr. Washington found no gross knee instability, but moderate degenerative knee changes.  In April 2002, Dr. Washington told Anderson he could continue with conservative treatment procedures for his left knee, or choose arthroscopic surgery.  In June 2002, Dr. Washington performed a left knee arthroscopy with partial lateral meniscectomy.  After the surgery, Anderson pursued a successful course of physical therapy from July 15, 2002, until August 14, 2002.  On August 14, 2002, Anderson reported his pain was 3/10.  Throughout his treatment, Dr. Washington never placed any specific limitations on Anderson's physical activity or required Anderson to use an assistive device.  (Tr. 19-21.)

The ALJ repeated Anderson's alleged impairments.  Anderson had diabetes and hypertension.  The hypertension was always under control, and by the middle of 2004, Anderson's blood sugar levels were back to normal.  Anderson also complained of back pain, but the ALJ noted that an MRI of the spine in March 2002, showed no signs of disk herniation, spinal stenosis, or nerve root impingement or compression.  In April 2002, a colonoscopy showed nothing abnormal.  Anderson complained of left shoulder pain in January 2003, but an x-ray the following month, showed only minimal degenerative changes.  In January 2004, Anderson was hospitalized after an episode of double vision.  An MRI of the brain showed no acute intracranial process.  An eye examination in February 2004, showed no retinopathy.[13]  (Id.)

Despite these alleged impairments, the ALJ noted Anderson never took any strong medication.  No doctor ever stated or implied Anderson

---

[13]Retinopathy is a non-inflammatory degenerative disease of the retina.  Stedman's Medical Dictionary, 1353.

was disabled, and no doctor ever placed significant physical restrictions on Anderson's activities. Any restrictions of daily activities were a matter of personal choice, the ALJ concluded. In fact, the ALJ noted that Anderson had earned far more in 2003 -- after he allegedly became disabled -- than he ever had before. "As a matter of fact, the claimant has probably been 'not disabled' since the middle part of 2002, certainly since the beginning of 2003 . . . by virtue of his having been doing substantial gainful activity since that time, regardless of his medical condition." The ALJ found that Anderson's alleged impairments were not completely credible, and that he retained the residual functional capacity to lift or carry ten pounds frequently, and twenty pounds occasionally. The ALJ concluded Anderson was not disabled within the meaning of the Social Security Act, and could perform the full range of light-sedentary work. (Tr. 19-24.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. § 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20

C.F.R. § 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. § 416.920(a)(4).

In this case, the Commissioner determined that Anderson was not disabled and could perform the full range of light-sedentary work.

## V. DISCUSSION

Anderson argues the ALJ's decision should be reversed. Specifically, Anderson argues the ALJ committed reversible error when he incorrectly characterized him as 39 years old, and as a younger individual under the regulations. Anderson was 49 years old at the time of the decision. In addition, Anderson argues the ALJ committed reversible error by failing to consider evidence of his knee impairments. Finally, Anderson argues the ALJ failed to consider that he was not able to perform all of his job duties. Because of his impairments, Anderson argues the church job was merely a "pity job," and not evidence of substantial gainful activity. (Doc. 19.)

**Incorrect Age**

The ALJ incorrectly stated Anderson's age. However, Anderson's age played little part in the ALJ's decision. Instead, the ALJ carefully considered Anderson's objective medical history, his subjective complaints and limitations, and his recent work history. In reaching his decision, the ALJ noted Anderson's doctors never prescribed him strong medication and never placed any significant physical restrictions on his activities. See Combs v. Astrue, 243 F. App'x 200, 205 (8th Cir. 2007) (Non-prescription pain medications and over-the-counter medications are inconsistent with complaints of disabling pain.); see also Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability.").

The ALJ also considered Anderson's recent work activity. From June 2002, until at least the supplemental hearing on October 7, 2004, Anderson performed custodial work for a church. Working twenty-five to thirty hours a week, Anderson vacuumed the carpets, dusted, mopped, cleaned the restrooms, and emptied the trash. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) ("Working generally demonstrates an ability to perform a substantial gainful activity."). Looking to the earnings guidelines, the ALJ concluded that Anderson's custodial work amounted to substantial gainful activity. The ability to perform substantial gainful activity necessarily precludes a finding of disability. See 42 U.S.C. § 1382c(a)(3)(A). Only one sentence in the ALJ's opinion referred to Anderson's age. Under the circumstances, this brief misstatement was harmless and does not constitute a reversible error. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (The ALJ's incorrect characterization of claimant's age was a harmless error.). Substantial evidence supports the ALJ's conclusion that Anderson could perform the full range of light-sedentary work.

**Knee Impairments**

The ALJ considered Anderson's knee impairments in several paragraphs of his opinion. In fact, the ALJ noted Anderson had "degenerative joint disease and recurrent swelling in his left knee as far back as February 2001 . . . ." (Tr. 20.) The ALJ noted how, in February 2001, Dr. Washington found Anderson could be on his feet as tolerated and showed no gross knee instability. The ALJ noted that, in April 2002, Dr. Washington presented Anderson with the option of conservative treatment or surgery. The ALJ also discussed Anderson's knee surgery in June 2002. In addition, the ALJ discussed Anderson's follow-ups with Dr. Washington, noting that Dr. Washington never placed any specific limitations on his physical activity or required him to use an assistive device. See Hensley, 352 F.3d at 357. Finally, the ALJ considered how Anderson's impairments affected his ability to work. Under the circumstances, the ALJ considered evidence of Anderson's knee impairments.

**Job Duties**

During the hearing, the ALJ questioned Anderson about what tasks he was able to perform as the church's custodian. In the opinion, the ALJ noted that Anderson began working at the church just after his knee surgery. Anderson never argued his job was subsidized, or that he was otherwise being paid for work he did not do. As part of his job, Anderson worked twenty-five to thirty hours a week, during which he vacuumed the carpets, dusted, mopped, cleaned the restrooms, and emptied the trash. See Goff, 421 F.3d at 792. The church withheld taxes from his paycheck, but did not offer benefits.

Under the regulations, sedentary work is work that involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like files, ledgers, and small tools. 20 C.F.R. § 416.967(a). Sedentary work also involves a certain amount of walking and standing. Id. Light work is work that involves lifting no more than twenty pounds at a time, with frequent lifting of objects weighing up to ten pounds. 20 C.F.R. § 416.967(b). Light work requires a good deal of walking or standing. Id. Anderson's custodial work is completely consistent with the definitions of sedentary and light work found in the federal regulations. Therefore, the ALJ correctly determined that Anderson's custodial work could be considered substantial gainful activity. Since Anderson was performing substantial gainful activity, he was not disabled within the meaning of the Social Security Act. See 42 U.S.C. § 1382c(a)(3)(A). Substantial evidence supports the ALJ's decision that Anderson could perform the full range of light-sedentary work.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate order is issued herewith.


        /S/  David D. Noce
        **UNITED STATES MAGISTRATE JUDGE**

Signed on February 20, 2008.